UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br>　　Plaintiff<br><br>v.<br><br>PATRICK BAXTER,<br>　　Defendant. | )<br>)<br>)<br>)<br>)　CRIMINAL NO. 1:23-CR-10001-ADB<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS**

Defendant Patrick Baxter moves this Honorable Court, pursuant to Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure, to suppress from the use in evidence of any item seized from a search of Mr. Baxter's home on November 2, 2021. The evidence was obtained in violation of the Fourth Amendment to the United States Constitution.

**I. FACTS**

Mr. Baxter stands accused of knowingly possessing child pornography on November 2, 2021, and with knowingly receiving child pornography over a one-month period in mid-2021. Dkt. 15; 18 U.S.C. § 2252A. The possession charge relates to a Samsung solid state drive found on a coffee table in the Baxter family home. Dkt. 1 ¶¶ 6, 11–13. The receipt charge relates to an undercover internet operation conducted by the FBI in mid-2021. Dkt. 1 ¶ 13. The seizure of the Samsung drive occurred during the government's execution of a search warrant. Dkt. 1 ¶¶ 4–8.

The search warrant was issued based on an affidavit by FBI Special Agent Bryce Montoya. Montoya Affidavit, Exhibit 1, "Affidavit of Special Agent Bryce Montoya in Support

of an Application for a Search Warrant" ("Montoya Aff."). At the time he applied for the search warrant, Montoya had only been an FBI agent for three and one-half years. Montoya Aff. ¶ 1. In his short time in the bureau, Montoya has been pulled to cover investigations ranging from fraud, narcotics, and white-collar investigations to human trafficking and online sexual exploitation of children. Montoya Aff. ¶ 1.

Investigators in this case used a "modified version" of the Freenet internet peer-to-peer file sharing software to monitor file requests that were being sent out over that peer-to-peer network. Montoya Aff. ¶ 17.[1] When a user requests a file in the Freenet network, the system sends requests for discrete portions of the file to all of that user's "peers." Montoya Aff. ¶¶ 6, 9. The system does not request the full file from all of the peers, and the pieces of the file are encrypted so the users who hold those portions on their computers are unable to know what the file contains. Montoya Aff. ¶¶ 7, 9. If unsuccessful, those peers divide the request again and pass the request along to their peers. Montoya Aff. ¶¶ 9–10.

This case involves an operation called "Operation Pressure Washer" that was conducted by the FBI's Child Exploitation Operational Unit (CEOU).[2] Between June 4 and July 2, 2021, a user requested "files of interest" (files that the investigators know) from a law enforcement computer. Based on a "formal mathematical formula" contained in a "peer-reviewed, publicly-available academic paper," Montoya concluded that it was "significantly more probable than not" that the user at internet protocol address 100.0.180.154 was requesting pieces of three files

---

[1] The defense is planning to request that a copy of the "modified version" of the software that was used in this case be provided as being material to the preparation of the defense. Fed. R. Crim. P. 16(a)(1)(E)(i); *United States v. Budziak*, 697 F.3d 1105 (9th Cir. 2012).

[2] The Office of the United States Attorney has not provided the defense with any discovery related to the portions of this investigation that were conducted by the CEOU. The defense is planning to request those materials be provided in discovery.

of interest on June 4 and July 2. Montoya Aff. ¶¶ 20, 23. The three files were the only evidence Montoya presented to support a claim that any federal crime had been committed. Montoya Aff.

Montoya's complete description of the three files follow:

<u>June 4, a file with the SHA1 digital hash ending in -6UJC</u>:

> This file is a video which is approximately 27 minutes and four seconds long. In the video, a prepubescent female child who appears to be approximately 8-10 years old can be seen in various stages of undress. The child at times in the video has a social media filter on, which portrays the child as having cartoon ears and whiskers. The child's genitals and anus are visible at various times in the video. The child can be seen inserting an unknown object into her vagina at one point of the video and can be seen manipulating her genitals and anus with her hand for the camera.

Montoya Aff. ¶ 24.

<u>June 4, a file with the SHA1 digital hash ending in -ZP24</u>:

> This file is a video which is approximately 9 minutes and 55 seconds long. In the video, a prepubescent female child who appears to be approximately 8-10 years old can be seen in various stages of undress. The child at times in the video has a social media filter on, which portrays the child as having cartoon ears and whiskers. Multiple times throughout the video the child's genitals and anus are visible. The child can be seen digitally penetrating her vagina and anus, as well as penetrating her vagina with a toothbrush.

Montoya Aff. ¶ 25.

<u>July 2, a file with the SHA1 digital hash ending in -GYKV</u>:

> This file is a video which is approximately 10 minutes and 45 seconds long. In this video, a pubescent female child who, based on slight breast development and hair present in her genital area appears to be approximately 12-15 years old can be seen in various stages of undress. At times in the video, the child can be seen penetrating her vagina and anus with her fingers.

Montoya Aff. ¶ 26.

This information, combined with a subpoena response from Verizon that IP address 100.0.180.154 was assigned to the Baxter home at the time of the Freenet activity on June 4 and July 2, caused Montoya to conclude that "there is probable cause to believe that" the federal child pornography laws had "been violated, and that the contraband, property, evidence, fruits and instrumentalities of these offenses" were located in the Baxter home. Montoya Aff. ¶ 51. Magistrate Judge Dein issued the search warrant on October 29, 2021.

## II. ARGUMENT

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. U.S. CONST. AMEND. IV. It further provides that "no [w]arrants shall issue, but upon probable cause, supported by [o]ath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id*.

Whether an affidavit establishes probable cause is a question of "whether, given all the circumstances set forth in the affidavit[,] . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). An affidavit "must provide the magistrate with a substantial basis for determining the existence of probable cause, and [a] wholly conclusory statement . . . fail[s] to meet this requirement." *Id*. at 239. The "unsupported conclusions [of an officer] are not entitled to any weight in the probable cause determination." *United States v. Vigeant*, 176 F.3d 565, 571 (1st Cir. 1999).

Montoya here claimed that the facts he presented to Magistrate Judge Dein established probable cause that "the federal criminal statutes cited herein have been violated." Montoya Aff. ¶ 51. The only federal criminal statute that he cited in the affidavit was 18 U.S.C. § 2252A. That

statute makes it a crime if any person to knowingly receives or distributes "any child pornography" or "any material that contains child pornography." 18 U.S.C. § 2252A(a)(2). It also proscribes possessing child pornography. 18 U.S.C. § 2252A(a)(5). Montoya did not seek a warrant to search for any other federal criminal evidence, such as evidence of "obscene" materials. *See* 18 U.S.C. § 1460–1470.

"Child pornography" has a particular definition under federal law. It is limited to a "visual depiction" of "sexually explicit conduct" where "the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct." 18 U.S.C. § 2256(8).[3] A minor is specifically defined as a person under 18. 18 U.S.C. § 2256(1). The term "sexually explicit conduct" is also specifically defined in the statute: it is "graphic sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal," "bestiality," "masturbation." "sadistic or masochistic abuse," or "graphic or simulated lascivious exhibition of the anus, genitals, or pubic area of any person." 18 U.S.C. § 2256(8)(B).

The First Circuit, as has every other Circuit Court of Appeals, has adopted to some extent the so-called "*Dost* Factors" to determine whether a particular depiction is "lascivious." *United States v. Amirault*, 173 F.3d 28, 31–32 (1st Cir. 1999) (quoting *United States v. Dost*, 636 F.Supp. 828, 832 (S.D.Cal. 1986), aff'd sub nom., *United States v. Wiegand*, 812 F.2d 1239, 1244 (9th Cir. 1987); see also *United States v. Sheehan*, --- F.4th ---, at *18 n.4 No. 21-1983 (1st. Cir., June 8, 2023) ("although we find these factors generally relevant and useful for the guidance they provide, they are neither comprehensive nor necessarily applicable in every

---

[3] The statute also purports to criminalize other visual depictions that do not involve the actual use of real children to create the depictions. See 18 U.S.C. § 2256(8)(B-(C). Those portions have been declared unconstitutional by the Supreme Court. See *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002).

situation."). Thus, "child nudity alone does not make an image pornographic." *Sheehan*, --- F.th at *17 (citing *Amirault*).

The useful but not comprehensive *Dost* factors include:

> 1) whether the focal point of the visual depiction is on the child's genitalia or pubic area;
>
> 2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity;
>
> 3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;
>
> 4) whether the child is fully or partially clothed, or nude;
>
> 5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity; [and]
>
> 6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

*Sheehan*, --- F.4th at *17.

### A. Montoya's Conclusory Affidavit was Insufficient to Demonstrate Probable Cause

In a pattern that has become disturbingly commonplace, the government here relied only on a bare-bones description of nudity and knowingly failed to present the images to the magistrate judge to permit her to make the determination of whether the images were lascivious. Montoya Aff. ¶¶ 24–26. Under a long line of cases, the government was required to give the magistrate the facts to reach that conclusion, not to reach the conclusion for her. *Gates*, 462 U.S. at 238; *Vigeant*, 176 F.3d at 571; *Brunette*, 256 F.3d 14, 19 (1st Cir. 2001); *Sheehan*, --- F.4th at *18–19.

Yet that is what Montoya did here: describing the images instead of showing the images. That route resulted in a "defective" search warrant when the United States Attorney's Office in

Maine tried it more than 20 years ago in *Brunette*. 256 F.3d at 19. It was equally defective when the United States Attorney's Office in Massachusetts tried (in vain) to defend the same "fatal deficiencies" in a child pornography search warrant in *Sheehan* earlier this year. *Sheehan* at *30. And it was defective in this case.

> 1. The Affidavit's Conclusory Language Did Not Establish That the Files of Interest Contained Child Pornography as Defined Under Federal Law

For federal purposes, "child pornography" consists *only* where a depiction shows one of five types of conduct: intercourse, masturbation, bestiality, sado-masochistic bondage, or lascivious exhibition of the genitals. 18 U.S.C. § 2256(8). Three of those are clearly not present here. There is nothing in Montoya's description of the files he reviewed that could possibly be construed to be "intercourse," "bestiality," or "sado-masochistic bondage."

Nor does Montoya appear to describe masturbation. According to Merriam-Webster, masturbation is the "erotic stimulation especially of one's own genital organs commonly resulting in orgasm and achieved by manual or other bodily contact exclusive of sexual intercourse, by instrumental manipulation, occasionally by sexual fantasies, or by various combinations of these agencies." *See* https://www.merriam-webster.com/dictionary/masturbation. While Montoya reports that the videos showed a person "manipulating her genitals and anus with her hand," "digitally penetrating her vagina and anus, as well as penetrating her vagina with a toothbrush," or "penetrating her vagina and anus with her fingers," there is nothing presented to the magistrate to lead to any conclusion that the alleged minors in the depictions were engaging in "erotic stimulation" of their genitals. Montoya Aff. ¶¶ 24–26. Indeed, Montoya's description of the materials makes it hard to imagine that the alleged children were doing anything remotely close to stimulating themselves.

That leaves only the question of whether the depictions were "lascivious." 18 U.S.C. §§ 2252A; 2256(8). Montoya's complete description of the videos is set out above *in toto*. But to summarize, he alleged that all three showed the alleged minors "in various stages of undress." Montoya Aff. ¶¶ 24–26. He said that the genitals and anus of two of them "were visible" to the camera. Montoya Aff. ¶¶ 24–25. And he described the alleged minors putting things (fingers, a toothbrush, and an unknown object) into their genitals or anuses. Montoya Aff. ¶¶ 24–26.

Were the genitals and anus "the focal point" of any of the videos? *Sheehan*, --- F.4th at *17. We do not know (and neither did the magistrate), because Montoya did not describe the focal point in his affidavit. However, his insistence that the genitals simply "were visible" seems to imply the opposite. Were the visual depictions taken in a setting that is sexually suggestive? *Sheehan*, --- F.4th at *17. Montoya is silent about whether the location appeared to be a "place or pose" associated with sexual behavior, so the magistrate had nothing to go off of there, either. Were the alleged minors "fully or partially clothed, or nude?" *Sheehan*, --- F.4th at *17. Montoya failed to inform the magistrate of that fact. He only said that all three showed "various stages of undress." Montoya Aff. ¶¶ 24–26. Were the alleged minors in unnatural poses or wearing inappropriate attire? *Sheehan*, --- F.4th at *17. The magistrate had no way of knowing that, either, because if they were, Montoya kept those facts to himself. Did the depictions show "sexual coyness or a willingness to engage in sexual activity?" *Sheehan*, --- F.4th at *17. Not based on what Montoya wrote. Were the "intended or designed to elicit a sexual response in the viewer?" *Sheehan*, --- F.4th at *17. That would have been a question for the magistrate to determine. However, Montoya's bare description does not establish anything of the sort.

The First Circuit has had to correct the government repeatedly for failing to give the magistrate the tools to be able to decide whether a visual depiction is "lascivious." *Brunette*, 256

F.3d at 19; *Sheehan*, --- F.4th at *18–19. If the government wants to take that risk by hoping that the agent does a good enough job establishing the *Dost* factors with their words, they run the risk that the courts will have to (once again) intervene to instruct the government that it is the job of the magistrate, not a junior FBI agent, to decide whether an image is lascivious. That is what this Court must do here.

### 2. The Affidavit's Conclusory Language Did Not Establish That the Files of Interest Depicted Minors

Similarly, the affidavit failed to establish that the images even depicted minors. In each instance, Montoya gave his opinion that the people depicted in the videos "appeared to be approximately" certain ages. Montoya Aff. ¶¶ 24–26. Unlike some investigations, where the government can assert that a child in a depiction from a "series" of images is known to law enforcement to be a minor, here the government relied only on the assertion that Montoya believed that the people were a certain age. We (and more importantly, the magistrate) have no idea what basis Montoya has for making those assertions. We do not, for example, know if Montoya has children of his own from which he could benchmark his approximation of the physical development of these children. If he does, he did not tell the magistrate that fact. We do not know if Montoya referred to any of the accepted methods used by medical professionals to estimate the ages of children. But, again, if he did so, he failed to tell the magistrate. For that matter, there is nothing to indicate that the people depicted in the videos were not manipulated by the ever-increasing technology that can "morph" images or create them out of nothing. To the contrary, Montoya acknowledged that two of the videos were distorted through the use of apparent "social media filters" that obscured the faces of the people in them by giving them animal body parts. Montoya Aff. ¶¶ 24–25. It is simply not enough for Montoya to tell the

magistrate that the videos show signs of being manipulated and then to give his entirely unsubstantiated opinion about the ages of the people in them.

As with the lasciviousness, this is not the first time that the government has had this problem. *United States. v. Syphers*, 426 F.3d 461, 466 (1st Cir. 2005). There, the government "did not include the images seized previously or provide any detailed description of the physiological features of the persons depicted in those images (i.e., by describing body proportion, growth and development)." In *Syphers*, the First Circuit concluded that the affidavit "may have" demonstrated probable cause, "[i]n the particular circumstances of this case." *Id*. Those "particular circumstances" included the case beginning with Syphers' "alleged photographing and fondling of minor girls, ages fourteen and fifteen, both of whom the police interviewed" and "pornographic materials [that] appeared to originate from a website identified as www.lolitas.com, 'Lolita' being a well-known moniker for minor girls." *Id*. but even under these facts, the First Circuit found this "a tough call" because of the agent's failure to "include the images" or explain the basis for his opinion. *Id*.

The First Circuit dodged the question, however. The Court held that it did not need to determine whether omission of the photos or an explanation of the age estimation established probable cause because, once again, the good faith exception to the exclusionary rule applied. *Id*. at 467. The First Circuit noted that the *Syphers* warrant had been issued just months after *Brunette*. *Id*.

> 3. <u>The Affidavit Did Not Establish that the Internet User at IP Address 100.0.180.154 had Knowingly Requested Materials Containing Child Pornography</u>

Here, the government was looking for people who seek out child pornography on the Freenet network. Based on the discovery provided (so far), it appears that the investigation was being run out of the FBI's Child Exploitation Operational Unit (CEOU) in the D.C. area. They

presumably farmed out the leads to FBI field offices, including this lead. What Montoya told the magistrate, however, is that the pieces of the "files of interest" are encrypted by Freenet before being distributed and that no person who possesses the encrypted pieces can make out any part of that file without a key. Montoya Aff. ¶¶ 6–8. Despite knowing the files that the internet user was requesting, Montoya declined to tell the magistrate what the Freenet keys were for the files that they intercepted in this case. While the affidavit discusses that some users find these keys in forums where the abuse of children is openly discussed, or where the files are described, there is no way to know whether the person who requested the files mentioned in the affidavit even knew what the files contained. Montoya said so explicitly: "I am not aware of how, or from where, this particular Freenet user obtained a key in order to attempt to retrieve the files of interest described." Montoya Aff. ¶ 18. Whoever it was who requested the file, there was no evidence presented to the magistrate that they sought out child pornography. The statute only makes it a crime to "knowingly" receive or possess those materials.

      Assuming, however, that the mere request for a file, whose contents cannot be known until you have decrypted it, and whose "key" may or may not contain any information that suggests what the file contains, constitutes "knowingly" receiving the pornography, the affidavit fails (for a third time) to give the magistrate the facts to support Montoya's conclusion. According to Montoya, there exists a "formal mathematical formula" contained in a "peer-reviewed, publicly-available academic paper," that helps to determine the likelihood that a Freenet user is just passing along somebody else's request or is originating the request. Montoya Aff. ¶¶ 20, 23. What is this "formal mathematical formula?" We are left in the dark, as was the magistrate. When the known information from this investigation was plugged into the "formal mathematical formula," what result did the formula give? Again, if anybody did the math in this

case, Montoya did not provide that data to the magistrate. As with all of the other aspects of this case, rookie agent Montoya simply asked the magistrate to accept his conclusions, even when he knew that there was original evidence that he could have provided her. See Montoy Aff. fns. 4, 6.

**B. The *Leon* Good Faith Exception Does Not Apply**

When the government made their mistake in *Brunette*, the prosecution was unaffected. Despite holding that the warrant was "defective" for failing to give the magistrate enough facts to reach a conclusion, the First Circuit declined to suppress the evidence on the basis of *Leon* good faith. *Brunette*, 256 F.3d at 19–20 (citing *United States v. Leon*, 468 U.S. 897 (1984)). Their reasoning was that "although we hold that the omission of images or a description of them was a serious defect in the warrant application, the uncertain state of the law at the time made reliance on the warrant objectively reasonable." *Id*. at 19. Noting that "the state of the law remained unclear at the time of the January 1999 warrant application," they would decline to exclude the evidence. But the First Circuit was crystal clear in *Brunette*: "Having now resolved this point, we would, in the future, view quite differently an agent's choice to withhold photos from a judicial officer." *Id*. at 20. Thus, as the Massachusetts office of the United State Attorney recently learned the hard way, when the government persists—a full two decades after *Brunette*—in applying for a search warrant without giving the alleged pornographic images to the magistrate for review, the agents cannot rely on *Leon* good faith anymore. *Sheehan*, --- F.4th at *30–34.

The road to *Sheehan* has been long coming. Just a handful of months after *Brunette*, state law enforcement officers obtained a warrant without attaching the alleged child pornography for the magistrate to review in *Syphers*. As discussed above, they received another "good faith" pass from the First Circuit. But the government seems to have taken the *Brunette* and *Syphers* cases as

giving them carte blanche to continue refusing to comply with the requirements that the agents give the magistrate the information to allow them to find probable cause. See, e.g., Montoya Aff. at n. 6. The government cannot simply continue to combine a bare-bones affidavit with conclusory language with a failure to provide the images to the magistrate to review.

As the First Circuit recently admonished the government when they most recently failed to provide the child pornography images to the magistrate, "The good-faith exception is designed to cut police officers some slack when they get close calls wrong. The case at hand, however, does not fit that mold: it exhibits a failure in what is a core competency of a police officer—presenting sufficient probable cause of a crime to a neutral magistrate to justify the issuance of a warrant. Under the circumstances of this case, the good-faith exception does not apply, and suppression of the evidence is required." *Sheehan* at *37. Submitting a warrant application "so deficient in probable cause such that no officer could reasonably rely upon it is exactly the kind of police conduct the exclusionary rule is meant to deter." *Sheehan* at *39. "To hold otherwise would expand the good-faith exception to swallow, in a single gulp, the warrant requirement itself. That cannot be the law. If the good-faith exception is to have any limits, it cannot encompass the police conduct that occurred here." *Sheehan* at *39–40.

### III. CONCLUSION

For the reasons discussed above, the affidavit lacked sufficient facts for the magistrate to determine: (a) that the files depicted sexually explicit conduct; (b) that the people in the videos were under the age of 18; and (c) that somebody at the Baxters' residence knowingly tried to receive depictions of minor engaged in sexually explicit conduct. The warrant was issued without probable cause, and the government's long line of *Leon* free passes has been exhausted.

As such, Mr. Baxter asks that all evidence seized pursuant to the search of his home be suppressed and held inadmissible for use at trial.

                                                Respectfully Submitted,
                                                PATRICK BAXTER
                                                By his attorney

                                                /s/ Joseph B. Simons
                                                Joseph B. Simons, Esq.
                                                Simons Law Office
                                                10 Post Office Square, Suite 800
                                                Boston, MA  02109
Dated: September 4, 2023               (617) 544-9000
                                                BBO # 684030